**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-40272
Summary Calendar
_____


VICKI J. MEDDERS,

> Plaintiff-Appellant
> Cross-Appellee,

VERSUS

AUSTIN COLLEGE,

> Defendant-Appellee
> Cross-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(4:94-CV-307)

_____


November 7, 1996
Before SMITH, DUHÉ, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Vicki J. Medders appeals a summary judgment in favor of Austin College on various claims arising out of her alleged sexual harassment by a college employee. Finding no error, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Medders, an employee of the physical plant at the college, alleges that she was sexually harassed by Audis Murphy, another employee of the physical plant. According to Medders, she notified Kay Garner, a co-worker, on approximately November 30, 1992, that she had refused Murphy's request that she sleep with him. Medders similarly told Garner that Murphy had threatened to rape her. Medders refused to pursue the matter further at that time, believing that Murphy's behavior was a passing event.

In December 1992 or January 1993, Medders reiterated her complaints to Garner and also complained to Harry Goodman, her immediate supervisor in the physical plant, that a male employee in the physical plant had threatened to rape her. Goodman encouraged Medders to pursue her complaint with the college's Sex Harassment Committee, but Medders refused to identify Murphy as the perpetrator and asserted that she would handle the matter herself. Finally in February 1992, after Murphy allegedly threatened to rape Medders and kill her family, Medders complained again to Garner, Goodman, and Karen Nelson, director of the Sex Harassment Committee, identifying Murphy as the perpetrator.

Medders was placed on paid leave pending the college's investigation of the incident, and Murphy also was instructed to take leave of his job and remain away from Medders until the matter could be resolved. Two days later, after college officials had investigated the complaints and interviewed Medders and Murphy (at

which time Murphy denied the accusations and insisted that he and Medders had had a consensual affair several years prior), they encouraged Murphy to take early retirement and instructed him to stay away from Medders. Murphy resigned the following day.

Upon her return to work, Medders was offered, and she accepted, free harassment advice and counseling with a faculty member at the college, which counseling continued for six weeks. When Medders elected not to enroll in the major medical insurance offered by the college to all employees, Medders continued the counseling at her own expense.

Medders left the college's employ in March 1994[2] after filing the instant action alleging causes of action under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12112, *et seq.*, and state law claims of intentional infliction of emotional distress and retaliatory discharge. The district court granted the college's motion for summary judgment on all claims.

## II.

We review a grant of summary judgment *de novo*. *See Hanks v. Transcontinental Gas Pipe Line Corp.*, 953 F.2d 996, 997 (5th Cir. 1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[2] The parties contest whether she was fired or abandoned her job.

4

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

A.

Medders first argues that the district court erred in finding that the college took prompt remedial action at the time it knew or should have known about Murphy's sexual harassment. Whether the remedial action was prompt requires an investigation of when the college received actual or constructive notice of the harassment.

To establish an actionable claim of sexual harassment in the work place, a plaintiff must demonstrate (1) that she belongs to a protected class; (2) that she was subject to unwelcome harassment; (3) that the harassment was based upon sex; (4) that the harassment affected a "term, condition or privilege of employment"; and (5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. *See Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987). Because the college conceded the first four elements for the purpose of its summary judgment motion, we consider only the fifth.

Medders asserts first that constructive notice attached on November 30, 1992, the date upon which she first notified Kay Garner, a co-worker, that Murphy had approached her about having

5

sex. Because Garner had served on the Sex Harassment Committee, which service had ended in 1992, Medders contends that the college's "failure to disseminate the information related to resignations and new appointments" to the committee caused her to rely to her detriment upon Garner's apparent authority to act with respect to such matters. "A prerequisite to a proper finding of apparent authority is evidence of conduct by the principal relied upon by the party asserting the estoppel defense which would lead a reasonably prudent person to believe an agent had authority to so act." *Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex. 1984) (citation omitted).

The college's failure to disseminate information about the committee resignation, on its own, is not sufficient conduct by the principal to support apparent authority. Furthermore, Medders's reliance on such conduct is not reasonable; Medders easily could have asked Garner whether she was still a member of the committee. Because Garner had no apparent authority to bind the college, she could not have imputed constructive notice of the harassment to the college as of her November 30, 1992, conversation with Medders.

Medders next argues that Austin had constructive notice of the harassment as of her December 1992 conversation with Harry Goodman, a supervisor, in which Medders told Goodman that a male employee had threatened to rape her. It is undisputed that on this occasion Medders refused to identify Murphy as the male employee and that

6

Goodman encouraged Medders to contact the Sex Harassment Committee to pursue further her allegations.  Medders refused Goodman's advice, however, saying that she would handle the situation herself.

Notwithstanding this interchange, Medders contends that, because of the severe nature of the threats involved, Austin had a duty independently to obtain the identity of the harasser and that this duty estops Austin from denying constructive notice.  Citing *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir. 1986), Medders notes correctly that "an employer who has reason to know that one of his employees is being harassed . . . and does nothing about it is blameworthy."

Medders neglects the remainder of the paragraph, however, in which the court explains that such "reason to know" arises only where the harassment is "so egregious, numerous and concentrated as to add up to a campaign of harassment."  *Id.*  Medders's single complaint to Goodman, coupled with her refusal to identify Murphy as the perpetrator and her rebuffing of Goodman's suggestion that she pursue the matter further with the committee, does not rise to an actionable level.  Goodman did not turn a deaf ear to Medders's allegations, but rather responded appropriately under the circumstances.

We agree, therefore, with the district court that the college lacked constructive notice of Murphy's harassment of Medders until

7

February 1993, at which time Medders told Goodman and Murphy, among others, that Murphy himself had threatened to rape her and kill her family.  It is undisputed that this complaint was sufficient to provide the college with notice, and it is from this date that we now measure the promptness and effectiveness of the college's remedial action.

Once an employer has notice of harassment, it must take prompt remedial action in response.  *See Jones*, 793 F.2d at 719-20. Remedial action must be "reasonably calculated" to end the harassment, *see id.*, including appropriate discipline directed at the offending party.  *See Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989).  What is appropriate remedial action depends upon the facts and circumstances of each individual caseSS"the severity and persistence of the harassment, and the effectiveness of the initial remedial steps."  *See id.*

It is undisputed that immediately upon hearing Medders's allegations, Goodman excused Medders to go home on leave with pay and excused Murphy with instructions not to speak with Medders nor to return to work until instructed.  Goodman then contacted the Vice President and Director of Personnel to set up a meeting with those parties and Medders, subsequent to Medders's meeting with the Sex Harassment Coordinator and Faculty Advisor.  Medders was given an opportunity to reiterate her allegations and then returned home on paid leave.

8

Murphy met with the same group twice in the subsequent two days, during which meetings he vehemently denied the accusations and reported that he and Medders had had a consensual affair years earlier. Murphy was advised to resign with his retirement benefits and instructed not to appear at the physical plant (Medders's work place), save for the benefits administration office. Murphy acquiesced, and Medders remained on paid leave until March 3, 1993.

Medders objects to the adequacy of the college's remedial action because "[t]here is a genuine issue of material fact as to whether simply allowing Murphy to retire with full benefits while refusing to make accommodations to the Plaintiff constituted prompt and appropriate remedial action." Whether Medders likes or dislikes Murphy's retirement package is inapposite to an evaluation of the adequacy of the remedial action. We have required only that employers take steps "'reasonably calculated' to halt the harassment," *see* *id.*, and removing Murphy from the workplace and enjoining his contact with her, is in fact so reasonably calculated to end the harassment.[3]

Furthermore, the college provided Medders, upon her return to work, six weeks worth of free harassment advice and counseling with a faculty member on the committee. The free counseling was

---

[3] We also disagree with Medders that the fact that she was required to use her sick leave and vacation time for counseling juxtaposed with the college's grant of retirement benefits to Murphy "demonstrates a conscious, deliberate pattern of gender discrimination and an affirmance of Murphy's wrongful conduct."

terminated only because Medders later elected not to enroll in the major medical insurance offered to all employees.[4] In light of the prompt and effective remedial action, "[t]he uncontested evidence demonstrates a model of prompt, sensitive employer handling of these very traumatic issues." *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993) (per curiam).

## B.

Medders next alleges that the college's decision to terminate[5] her employment in March 1994 was motivated by her filing workers' compensation and EEOC claims and thus was impermissibly retaliatory. To establish a retaliation claim, a plaintiff must prove (1) that she engaged in activity protected by title VII; (2) that an adverse employment action occurred; and (3) that a causal connection existed between the participation in the protected activity and the adverse employment action. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992). The employee bears the burden of establishing the causal link, which may be shown by circumstantial evidence. *See Palmer v. Miller Brewing Co.*, 852 S.W.2d 57, 61 (Tex. App.SSFort Worth 1993, writ denied). The employer may then rebut the allegations by showing a legitimate reason for the discharge. *Id.*

---

[4] Medders continued with counseling at her own expense.

[5] Again, we note that the parties contest whether Medders was fired or abandoned her job.

Without deciding whether Medders has met her burden, we note that the college has proffered a non-discriminatory reason for its terminationSSMedders's unsatisfactory work performance, tardiness, and absenteeism, as documented in Goodman's letter to Medders of March 9, 1994. *See Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (holding that employer is entitled to summary judgment when it proffers a legitimate, non-discriminatory reason for termination and the employee fails to controvert such evidence). Among the deficiencies Goodman notes in his letter are (1) over fifteen dates from December to February during which Medders either left early, arrived late, or failed to appear for work; (2) Medders's failure to correct problems in job performance that had been brought to her attention in two previous meeting with Goodman in January and February; (3) Medders's failure to inform Goodman in advance of her leaving for doctors' appointments; and (4) her failure to concentrate on her work product.

Medders objects to the college's proffered rationale, suggesting that its contention of diminished work performance is merely a pretext to an unlawful discharge. Medders offers no contradictory evidence, however, other than her own affidavit denying Goodman's charges and the affidavit of a student co-worker.[6] The co-worker's affidavit does not even deny each of

[6] Medders mistakenly cites *Palmer*'s discussion of the use of circumstantial evidence to prove a causal link in support of her pretext argument. As *Palmer* notes, however, such evidence is not apposite to challenge pretext, but only to

(continued...)

11

Goodman's charges, but merely attempts to establish that Goodman "seemed to have a negative, sexist, chauvinistic attitude toward women. I felt he talked down to women, was condescending and showed no respect in general." Such conclusory, subjective beliefs are not competent summary judgment evidence and are insufficient to call into question the proffered rationale for Medders's termination. *See Carrozza*, 876 S.W.2d at 314.

## C.

Medders next challenges the dismissal of her intentional infliction of emotional distress claim, arguing that the district court failed to inquire whether the college's conduct in response to her complaints of harassment (not Murphy's conduct itself for which the court properly found that the college could not be held liable) is actionable. To establish intentional infliction of

---

[6](...continued)
establish *a priori* that a causal link exists, which then shifts the burden to the employer to proffer a nondiscriminatory reason for discharge. See 852 S.W.2d at 61–62.

Medders also offers, as evidence of the causal connection between her termination and the protected activity, Goodman's letter to her of August 1993 explaining the procedures for filing a workers' compensation claim in which Goodman also notes that, once a claim is filed with the carrier, the college may lose control over the her files for the purposes of maintaining confidentiality. Although we have noted in *dicta* that a manager's statement that he could not investigate a harassment claim without revealing the victim's identity coupled with others managers' suggestions that an investigation would be detrimental to the victim, evinced an attempt to dissuade the victim from seeking an investigation, *see Waltman*, 875 F.2d at 480, such is not the case here. Having reviewed Goodman's letter in the context of the other evidence proffered by Medders, we disagree that "[c]learly Goodman knew of the fear that Plaintiff had of Murphy . . . and utilized this knowledge in an attempt to intimidate her from filing her Worker's Compensation Claim."

emotional distress, a plaintiff must show (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff emotional distress; and (4) that the emotional distress suffered was severe. *See Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).

We simply disagree that the litany of complaints Medders lodges in the wake of her harassment complaint rises to the level of extreme and outrageous conduct that it "utterly intolerable in a civilized community." *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989).[7] As discussed above, the college handled an unfortunate situation with adequate and prompt remedial action and attempted to accommodate Medders's fragile emotional state and multitude of absences from work to the best of its abilities. Medders's complaints about the retirement pension the college provided to Murphy, about the college's failure to re-institute sick days and vacation days that Medders took during her recovery period, and about the fact that she chose not to accept the employer-provided medical insurance and thus was forced to pay out-of-pocket for her psychiatric treatment do not convince us otherwise.

---

[7] We disagree with Medders that *Dean* stands for the proposition that a litany of complaints creates a cognizable claim of intentional infliction. Because we noted in *Dean* that the "check incidents" alone were sufficient to support the claim, we did not consider the rest of the plaintiff's complaints. *See* 885 F.2d at 307.

13

D.

Medders challenges the dismissal of her claim under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12112, *et seq.* In order to state a *prima facie* case of employment discrimination under the ADA, a plaintiff must show that (1) she has a disability; (2) she was a qualified individual with a disability; and (3) the defendant's termination of her employment constituted unlawful discrimination. *See Tyndall v. National Educ. Ctrs., Inc. of California*, 31 F.3d 209, 212-13 (4th Cir. 1994). A disability is a physical or mental impairment that "substantially limits"[8] one or more "major life activities." *See Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). A substantial work limitation is one that restricts the claimant from performing "a class of jobs or a broad range of jobs in various classes . . . . The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

Medders claims that the emotional distress stemming from Murphy's harassment substantially limits her ability to engage in the major life activity of "working in a broad class of jobs

---

[8] "Substantially limit" means (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. See 29 C.F.R. § 1630.2(j)(1)(i), (ii).

involving the type of stress found in work environments where there are predominately middle-aged to older males, particularly when they are in positions of authority."[9]  Because we do not believe that Medders has established a compensable "disability" under the ADA, we affirm on different grounds.[10]  "Jobs involving the stress found in work environments where there are predominately middle-aged to older males" is not a sufficient definition of a class of jobs or broad range of jobs in which Medders's disability prevents her from working.

The proper question under the ADA is whether Medders's emotional distress substantially limits her ability to perform her job as a secretary; finding no such evidence, we affirm.  *See, e.g., Bridges v. City of Bossier*, 92 F.3d 329, 335-36 (5th Cir. 1995) (discussing more fully the requirements for demonstrating a substantial limitation on working).  The ADA was not intended to permit plaintiffs to bootstrap specious title VII or intentional infliction of emotional distress claims into compensable ADA claims by carefully inventing broad categories of jobs that they claim they are no longer able to perform.

---

[9] Medders also claims that her impairment substantially limits her ability to engage in the major life activity of "social functioning."  We are at a loss to find in the ADA even a modicum of support for such a major life activity.

[10] We may affirm on any legal grounds apparent from the record.  *See Sojourner T. v. Edwards,* 974 F.2d 27, 30 (5th Cir. 1992), *cert. denied,* 507 U.S. 972 (1993).

## II.

Medders finally asserts that the district court erred in failing to grant her motion to compel documents that the college asserted as privileged. Medders argues on appeal that the documents should not have been withheld as privileged, but the district court denied Medders's motion on alternate grounds§§that Medders waited nine months before filing her motion and eventually did so after the docket control order's deadline for completion of discovery. Because Medders offered no justification for the delay, the court denied her motion. We do not believe that the district court abused its discretion to handle such pre-trial discovery matters. *See Robinson v. State Farm Fire & Cas. Co.*, 13 F.3d 160, 164 (5th Cir. 1994).

## III.

The college cross-appeals for an award of attorneys' fees, contending that Medders's title VII claims are frivolous, unreasonable, or without foundation. *See Christianburg Garment Co. v. Equal Empl. Opportunity Comm.*, 434 U.S. 412, 421 (1978). The district court refused without comment to award fees, and we do not find any abuse of discretion. *See Hadley v. VAM P T S*, 44 F.3d 372, 375 (5th Cir. 1995). We similarly reject the college's suggestion to remand for specific findings with respect to the attorneys' fees. *See White v. South Park Indep. Sch. Dist.*, 693

16

F.2d 1163 (5th Cir. 1982).

AFFIRMED.